# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP2882 |
| COMPLETE TITLE: | Dr. Randall Melchert, Happy Hobby, Inc. and The Warren V. Jones and Joyce M. Jones Revocable Living Trust, <br>            Plaintiffs-Appellants-Petitioners, <br>     v. <br> Pro Electric Contractors and Secura Insurance, A Mutual Company, <br>            Defendants-Respondents. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 363 Wis. 2d 654, 862 N.W.2d 902
(Ct. App. 2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | April 7, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 9, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Waukesha |
|   JUDGE: | James R. Kieffer |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ABRAHAMSON, J. concurs (opinion filed). |
|   DISSENTED: | BRADLEY, R. G., J. joined by KELLY, J. dissents (opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellants-petitioners, there was a brief by *Rudolph J. Kuss*, and *Stevens & Kuss, S.C.,* Brookfield, and oral argument by Rudolph J. Kuss.

For the defendants-respondents, there was a brief by *Amy M. Freiman*, *Rick E. Hills* and *Hills Legal Group, LTD,* Waukesha, and oral argument by Amy M. Freiman.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No.   2013AP2882
(L.C. No.  2013CV535)

STATE OF WISCONSIN        :      IN SUPREME COURT

Dr. Randall Melchert, Happy Hobby, Inc. and The Warren V. Jones and Joyce M. Jones Revocable Living Trust,

      Plaintiffs-Appellants-Petitioners,

  v.

Pro Electric Contractors and Secura Insurance, A Mutual Company,

      Defendants-Respondents.

**FILED**

**APR 7, 2017**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1   MICHAEL J. GABLEMAN, J.   We review an unpublished decision of the court of appeals that affirmed the Waukesha County circuit court's[1] grant of summary judgment in favor of Pro Electric Contractors ("Pro Electric"), after Pro Electric was sued for negligence in connection with its work as a contractor on a government construction project. Melchert v. Pro Electric Contractors, No. 2013AP2882, unpublished slip op. (Wis. Ct. App. Mar. 11, 2015).

---

[1] The Honorable James R. Kieffer presiding.

¶2 Dr. Randall Melchert, Happy Hobby, Inc., and The Warren V. Jones and Joyce M. Jones Revocable Living Trust ("Petitioners") brought suit after Pro Electric severed a sewer lateral[2] during an excavation, because the broken lateral caused flooding damage to property that Petitioners owned and occupied. Pro Electric moved for summary judgment, asserting immunity as a governmental contractor pursuant to Wis. Stat. § 893.80(4).[3] While Pro Electric admitted to severing the sewer lateral, it argued that the damage occurred because of construction design decisions made by the Wisconsin Department of Transportation ("DOT"), and that Pro Electric was merely implementing DOT's decisions. Following a hearing, the circuit court granted the motion and dismissed the case. The court of appeals affirmed.

---

[2] A "sewer lateral" is an underground pipe that connects a property to the sewer system. See Wis. Stat. § 182.0175(2m)(b) (2011-12) (requiring local government units to "mark the locations within the public right-of-way of all laterals connected to the sewer or water facilities . . . ."). All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

[3] Wis. Stat. § 893.80(4) provides:

No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

¶3 This case requires us to address the extent to which governmental immunity protects a private contractor implementing a construction design chosen by a governmental entity. We hold that Pro Electric is immune from liability for severing the sewer lateral because it acted in accordance with reasonably precise design specifications adopted by a governmental entity in the exercise of its legislative, quasi-legislative, judicial, or quasi-judicial functions.

¶4 This case also requires us to interpret and apply certain provisions of the Digger's Hotline statute, codified at Wis. Stat. § 182.0175. Petitioners allege that Pro Electric caused their damages not only by severing the sewer lateral, but also by backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made, as required by § 182.0175(2)(am)6.-6m.[4] Pro Electric is not immune from liability as to this second allegation, because DOT did not provide Pro Electric with reasonably precise specifications for inspecting sewer laterals for damage before backfilling pursuant to § 182.0175(2)(am)6.-6m. Ultimately, however, we affirm the

---

[4] Among other duties, Wis. Stat. § 182.0175(2)(am) requires an excavator to "do all of the following":

6. Before backfilling, inspect all transmission facilities exposed during excavation to ascertain if the transmission facilities have been or may have been struck, damaged, dislocated or disrupted.

6m. Refrain from backfilling an excavation until an inspection is conducted and any necessary repairs have been made by the owner of the transmission facility.

3

circuit court's grant of summary judgment on the factual record before us. We do so because the undisputed material facts do not support a reasonable inference that Pro Electric failed to comply with its duties under § 182.0175(2)(am).

¶5 We begin with a brief factual background and description of the procedural history, and we next set forth the applicable principles of governmental contractor immunity. We apply these principles respectively to the two aspects of Pro Electric's conduct that allegedly caused Petitioners' damages: (1) Pro Electric's conduct in severing the sewer lateral, and (2) Pro Electric's conduct in backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made, pursuant to Wis. Stat. § 182.0175(2)(am). Finally, we perform the necessary analysis to determine whether Pro Electric is entitled to summary judgment.

## I. FACTUAL BACKGROUND

¶6 We have set forth the facts that appear in the record and which the parties do not dispute. On July 25, 2011, DOT approved a plan for the improvement of a five-mile stretch of State Highway 190, also known as Capitol Drive, in Brookfield ("Project Plan"). The Project Plan spanned over 1,000 pages and contained specifications and detailed diagrams for the installation of new asphalt pavement, curbs, gutters, sidewalks, and traffic signals. Additionally, the DOT Highway Work Proposal for the project included over 100 pages of "Special Provisions" covering the various aspects of the project,

4

including a section on requirements regarding underground utilities.[5]

¶7 Following the bidding process, DOT awarded the project to Payne & Dolan as the general contractor. On January 5, 2012, Payne & Dolan entered into a subcontractor agreement[6] with Pro Electric to perform work on certain parts of the project, including the installation of traffic signals. For some of the traffic signals, the Project Plan directed Pro Electric to install new concrete bases to support the traffic signal poles.

¶8 This case concerns only the installation of the concrete base identified in the Project Plan as "SB2," located at the northeast corner of Capitol Drive and 128th Street and

---

[5] Article 6 of the Special Provisions in the Highway Work Proposal was entitled "Utilities," and among its other provisions it directed contractors to "[c]oordinate construction activities with a call to Diggers Hotline or a direct call to the utilities that have facilities in the area as required per statutes. Use caution to ensure the integrity of underground facilities and maintain code clearances from overhead facilities at all times."

[6] Although Pro Electric was a subcontractor, we use the term "contractor" throughout our opinion because "immunity extends to a subcontractor even though it has a contract with a general contractor rather than with a governmental authority." Bronfeld v. Pember Cos., 2010 WI App 150, ¶20 n.3, 330 Wis. 2d 123, 792 N.W.2d 222. The "reasoning for adopting the defense for contractors also applies to subcontractors," because "it is just as unfair for a subcontractor to be subjected to suit for carrying out a governmental directive as it is for the party directly contracting with the government." Jankee v. Clark Cty., 222 Wis. 2d 151, 165-66, 585 N.W.2d 913 (Ct. App. 1998), rev'd on other grounds, 2000 WI 64, 235 Wis. 2d 700, 612 N.W.2d 297.

identified by specific coordinates in the Project Plan.[7]  The Project Plan directed Pro Electric to install a "Type 10" concrete base to support the traffic signal pole for SB2 and to use a circular auger to drill the hole in the ground for the base.  The Project Plan specified that a Type 10 base required a hole that was 14 feet deep and 30 inches wide.

¶9  At least three days before Pro Electric started the excavation for SB2, Pro Electric contacted Digger's Hotline.  The statute requires an excavator to contact Digger's Hotline at least three days before beginning any excavation.[8]  Wis. Stat. § 182.0175(2)(am)1.  Under the statute, Digger's Hotline is then responsible for contacting the owners of transmission facilities[9] in the area, and the owners are responsible for ensuring that

---

[7] The Project Plan provided for SB2 to be located at Station 499+66.8 and at Location 86.8 LT.  These coordinates were measured in feet and identified the location to within a tenth of a foot.

[8] As defined in Wis. Stat. § 182.0175(1)(b), "excavation" means "any operation in which earth, rock or other material in or on the ground is moved, removed or otherwise displaced by means of any tools, equipment or explosives and includes . . . augering . . . ."  An "excavator" is "a person who engages in excavation."  § 182.0175(1)(bm).

[9] As defined in Wis. Stat. § 182.0175(1)(c), "transmission facilities" includes "all lines, pipelines, wires, cables, ducts, wirelines and associated facilities, whether underground or aboveground, . . . utility facilities, government-owned facilities, facilities transporting hazardous materials, communications and data facilities, drainage and water facilities and sewer systems."

such facilities are marked.  § 182.0175(1)(d)6., (2m)(a)2.[10]  Pro Electric instructs its employees to inspect the area visually for these markings before beginning excavation.

¶10  Pro Electric's employees augered the hole for SB2 on August 22, 2012.  Pro Electric used a circular auger attached to a truck at the end of a boom.  Two of Pro Electric's employees performed the work:  one was assigned to operate the auger from the truck and the other to monitor the auger and periodically clean it with a shovel.  As Craig Clements, president of Pro Electric, stated in his affidavit, drilling a hole with a circular auger "creates a situation where the technician operating the auger has no ability to see into the hole which is being augered."

¶11  DOT retained an engineering firm, HNTB, to ensure Pro Electric's compliance with the Project Plan, and an HNTB engineer, Julie Keller, was onsite to supervise the augering work.  The DOT Project Plan warned that "there may be other utility installations within the project which are not shown" on the diagram, but in anticipation of a contractor encountering

---

[10] Wis. Stat. § 182.0175(1m) requires owners of transmission facilities to be members of the Digger's Hotline organization and requires Digger's Hotline to "[a]ccept notices of intended excavation activity" and "[p]romptly transmit notice information to affected-member transmission facilities owners." § 182.0175(1m)(a), (d)3., (d)6.  Subsection (2m) makes it the owner's duty to "[r]espond to an excavation notice within 3 working days by marking the location of transmission facilities and, if applicable, laterals as provided under par. (b) in the area described in the excavation notice."  § 182.0175(2m)(a)2.

such unexpected utility installations, it further provided that "the engineer may adjust the locations of items under this contract to avoid conflict with existing utility facilities." Keller neither instructed nor authorized Pro Electric to change the location of SB2.[11] Nothing in the record suggests that either Pro Electric or Keller was aware, or had any reason to be aware, of any utility facilities in the way of the excavation for SB2. Pro Electric proceeded to complete the Type 10 concrete base in accordance with the specifications set forth in the DOT Project Plan.

¶12 At some point after the project was completed, sewage backed up into an adjoining commercial property. The property was owned by The Warren V. Jones and Joyce M. Jones Revocable Living Trust and occupied by Dr. Randall Melchert and Happy Hobby, Inc., as tenants. It was subsequently discovered that the sewer backup occurred because an underground sewer lateral serving Petitioners' property ran directly through the location of SB2, such that Pro Electric had severed that lateral while constructing SB2. Nothing in the record suggests that either Pro Electric or HNTB was aware at the time of construction that Pro Electric had severed anything. The sewer lateral had been

---

[11] Clements testified that, during an earlier augering excavation on the same DOT project, Pro Electric's employees noticed pieces of green PVC material coming up with the dirt. Keller determined that it was a damaged sewer lateral, and she instructed Pro Electric to move the excavation to a different location in order to allow a sewer contractor to make repairs.

8

made of clay, and the surrounding soil was also clay, thus making it unlikely that indicia of the damage would have been apparent among the material the auger was bringing up.[12] Clements stated in his affidavit that "[n]o employee of Pro Electric ever reported to me, HNTB, or the general contractor that any sewer lateral was struck during the installation of SB2. All Pro Electric employees were instructed that any such incident would need to be reported immediately."

## II. PROCEDURAL HISTORY

¶13 On March 1, 2013, Petitioners sued Pro Electric in the Waukesha County circuit court. Their complaint alleged that Pro Electric negligently severed the sewer lateral and then completed the project without repairing it. The complaint further alleged that, by doing so, Pro Electric thereby caused flooding and water damage to Petitioners' property, along with monetary losses, inconvenience, and other damages. In its answer, Pro Electric asserted immunity from suit as a

---

[12] Clements explained that the similarity of the materials is significant because of how augering works. An auger, he testified,

> grinds and pulverizes the ground and slowly starts bringing dirt to the surface. If the sewer line would have been PVC we would have immediately saw that there was something there. As an auger augers it's pushing everything up, and it will push everything into any voids in the hole, so as you look in a hole you will not see a pipe or anything because it gets packed with dirt. They had no way of knowing. If it would have been a newer one, yes, we would have known right away.

governmental contractor. The court held a summary judgment hearing on Pro Electric's motion on November 18, 2013.

¶14 In an oral ruling following the hearing, the circuit court granted summary judgment in favor of Pro Electric, ruling that it was immune from liability. The court concluded that, "under any reasonable view of the evidence, DOT design choices regarding the location and the depth of the traffic light caused this accident here. Those relevant design choices were made by the government." The court did not consider whether the Digger's Hotline statute, Wis. Stat. § 182.0175, imposed additional duties on Pro Electric, because the court determined that the statute did not apply. Therefore, the circuit court granted summary judgment to Pro Electric and dismissed Petitioners' case.

¶15 The court of appeals affirmed, concluding that Pro Electric was immune from liability for any damages that resulted from severing the sewer lateral. The court of appeals determined that the "project design decision [of] where and how to install the traffic light, as implemented by Pro Electric, is entitled to immunity under Wis. Stat. § 893.80(4) 'because it was made through the exercise of a legislative, quasi-legislative, judicial, or quasi-judicial function of the governmental entity.'" Melchert, unpublished slip op., ¶11 (quoting Showers Appraisals, LLC v. Musson Bros., 2013 WI 79, ¶34, 350 Wis. 2d 509, 835 N.W.2d 226). The court also examined Petitioners' allegation that Pro Electric was negligent in "backfilling the hole without repairing the severed sewer

10

lateral," concluding that the record "does not support a causal connection between [Petitioners'] specific allegations of negligence . . . and the alleged injury."  Id., ¶¶12-13.

### III.  STANDARD OF REVIEW

¶16  We review a grant of summary judgment independently, using the same methodology as the circuit court.  Oneida Cty. Dep't of Soc. Servs. v. Nicole W., 2007 WI 30, ¶8, 299 Wis. 2d 637, 728 N.W.2d 652.  "The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Wis. Stat. § 802.08(2).

¶17  "We review questions of statutory interpretation and application independently, but benefiting from the discussions of the circuit court and the court of appeals."  State v. Grunke, 2008 WI 82, ¶10, 311 Wis. 2d 439, 752 N.W.2d 769. "[D]etermining whether governmental immunity exists for particular conduct requires the application of legal standards to the facts found, which is also a question of law for our independent review."  Showers, 350 Wis. 2d 509, ¶21.

### IV.  DISCUSSION

A.  General Principles of Governmental Contractor Immunity

¶18  Our discussion begins with the longstanding principle that a governmental entity is immune from liability for acts done "in the exercise of its legislative or judicial or quasi-legislative or quasi-judicial functions."  Holytz v. City of

11

Milwaukee, 17 Wis. 2d 26, 40, 115 N.W.2d 618 (1962).  The legislature has codified this principle in Wis. Stat. § 893.80(4).  Showers, 350 Wis. 2d 509, ¶24 (citing Coffey v. City of Milwaukee, 74 Wis. 2d 526, 532, 247 N.W.2d 132 (1976)).  As we have recognized, immunity under § 893.80(4) "is available to a governmental entity only for those governmental decisions that are made as an exercise of 'legislative, quasi-legislative, judicial or quasi-judicial functions.'"  Showers, 350 Wis. 2d 509, ¶35.[13]  "Legislative and quasi-legislative functions generally refer to those policy choices made in an official capacity, e.g., when a governmental entity chooses one project design over another."  Id., ¶26 (citing Estate of Lyons v. CNA Ins., 207 Wis. 2d 446, 453, 558 N.W.2d 658 (Ct. App. 1996)).

¶19 It is also well established that a governmental entity's immunity may extend to private contractors acting as agents of the governmental entity.  Lyons, 207 Wis. 2d at 457-58.  A contractor asserting governmental immunity must prove two elements.  First, the contractor must show that it was an "agent" of the governmental entity under "the Lyons test, i.e., whether the governmental entity approved reasonably precise

---

[13] As we emphasized in Showers Appraisals, LLC v. Musson Bros., 2013 WI 79, 350 Wis. 2d 509, 835 N.W.2d 226, "[a]lthough some of our cases have equated § 893.80(4)'s 'legislative, quasi-legislative, judicial or quasi-judicial' standard with the term 'discretionary,' and although our decision is not intended in any way to alter that standard," the statute is best interpreted "by applying the legislature's chosen plain language, rather than a judicial distillation thereof."  Id., ¶35 (citations omitted).

specifications that the governmental contractor adhered to when engaging in the conduct that caused the injury." Showers, 350 Wis. 2d 509, ¶37.[14]

¶20 Second, "in addition to satisfying the Lyons test . . . a contractor asserting immunity must be able to demonstrate that the conduct for which immunity is sought was the implementing of a governmental entity's decision made during the exercise of the entity's legislative, quasi-legislative, judicial, or quasi-judicial functions." Id., ¶45. This is so because the contractor's immunity "is dependent upon the immunity of the governmental act or decision that the agent was implementing when it caused an injury." Id., ¶35. If that act or decision was made during the exercise of the governmental entity's legislative, quasi-legislative, judicial, or quasi-judicial functions, the governmental entity's immunity may extend to an agent implementing that act or decision. Id., ¶34.

¶21 For a private entity such as Pro Electric that is contracting with a governmental entity, this is where immunity ends. A contractor is not immune from liability if the governmental entity did not direct the injury-causing conduct

---

[14] The decision in Estate of Lyons v. CNA Insurance, 207 Wis. 2d 446, 558 N.W.2d 658 (Ct. App. 1996), also considered a contractor's independent "duty to the public [not to] withhold information about dangers that the government might not know about." Id. at 457 (citing Boyle v. United Techs. Corp., 487 U.S. 500, 512-13 (1988)). However, Showers clarified that this part of Lyons "does not bear on whether statutory agency is present." Showers, 350 Wis. 2d 509, ¶37 n.15.

with reasonable precision in the exercise of its legislative, quasi-legislative, judicial, or quasi-judicial functions. As we explained in Showers, the DOT contractor in that case was not immune from allegations of negligent construction work, in part because the contractor had not demonstrated that the allegedly negligent acts "were the implementation of a governmental entity's exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions." Id., ¶54. The overarching principle is that a "governmental contractor [is] entitled to the same level of immunity as would be accorded to the governmental entity had it been sued directly . . . ." Id., ¶31 (citing Lyons, 207 Wis. 2d at 454).

B. The Legislative or Quasi-Legislative Nature of Construction
Design Decisions

¶22 Decisions regarding the design and placement of individual elements incorporated into larger government construction projects have been held to be legislative or quasi-legislative decisions. For example, in Allstate Insurance v. Metropolitan Sewerage Commission of County of Milwaukee, 80 Wis. 2d 10, 258 N.W.2d 148 (1977), a driver was injured in an accident with a truck which was servicing a manhole located in the middle of the street. The plaintiffs claimed that the relevant governmental entity was negligent for placing the manhole in that particular location, id. at 14, but the court held that governmental immunity applied. "[T]he decisions of the [governmental entity] in planning and designing the system in question, including the placement of the manhole, were

14

legislative acts performed in response to its authority to plan and construct sewer systems . . . ." Id. at 15-16 (footnote omitted). Similarly, "decisions concerning the adoption of a waterworks system, the selection of the specific type of pipe, the placement of the pipe in the ground, and the continued existence of such pipe" are entitled to immunity. Milwaukee Metro. Sewerage Dist. v. City of Milwaukee, 2005 WI 8, ¶60, 277 Wis. 2d 635, 691 N.W.2d 658. It is, indeed, well settled that "acts of designing, planning, and implementing are legislative or quasi-legislative acts subject to immunity under [Wis. Stat.] § 893.80(4)." Bostco LLC v. Milwaukee Metro. Sewerage Dist., 2013 WI 78, ¶41 n.21, 350 Wis. 2d 554, 835 N.W.2d 160.

## C. Pro Electric's Immunity

¶23 We now apply the foregoing principles to the two aspects of Pro Electric's conduct that allegedly caused Petitioners' damages: (1) Pro Electric's conduct in severing the sewer lateral, and (2) Pro Electric's conduct in backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made, pursuant to Wis. Stat. § 182.0175(2)(am). We address each allegation in turn.

### 1. Pro Electric is Immune From Liability For Severing the Sewer Lateral

¶24 Pro Electric is immune from liability for severing the sewer lateral, because the DOT Project Plan provided reasonably precise specifications for Pro Electric's augering, Pro Electric severed the sewer lateral by adhering to those specifications, and DOT adopted the specifications in the exercise of its

15

legislative, quasi-legislative, judicial, or quasi-judicial functions.

¶25 Petitioners conceded at oral argument that the specifications in DOT's Project Plan for Pro Electric's augering were reasonably precise and that Pro Electric complied with those specifications exactly. While we are not bound by the concessions of the parties, see State v. Hunt, 2014 WI 102, ¶42 n.11, 360 Wis. 2d 576, 851 N.W.2d 434, we agree that a factual basis exists for Petitioners' concessions.

¶26 As for reasonable specificity, DOT directed the exact location for the augering using measured coordinates and specified the dimensions of the augering by directing that SB2 was to be constructed with a Type 10 base. A Type 10 base required a hole with particular dimensions: 30 inches in diameter and 14 feet deep, with between 2 and 4 inches of concrete exposed above ground. These dimensions gave Pro Electric discretion of no more than two inches as to the depth of the hole. DOT also specified the method of excavation: "Bases shall be excavated by use of a circular auger." Clements testified that this was a precise instruction, because variations among types of augers concern only the size, type of teeth, or the kind of truck on which the auger is mounted; otherwise, "[a]n auger's an auger." Given these facts and the fact that Petitioners do not contest this point, we have no difficulty concluding that DOT's specifications for the augering were reasonably precise.

¶27 Petitioners have also conceded that, when Pro Electric augered the hole for the concrete base for SB2, Pro Electric followed DOT's reasonably precise specifications as to the location and dimensions of the hole and the method of augering. Although Keller, the DOT-retained engineer, had authority to change the location of SB2, Pro Electric did not. As the circuit court concluded, Pro Electric "did what they were told to do by the DOT. In my opinion, there is no genuine issue of material fact as it relates to that." We agree, and we therefore conclude that Pro Electric complied with DOT's reasonably precise specifications as to the specific augering activities that severed the sewer lateral.

¶28 Finally, DOT adopted the specifications for Pro Electric's augering in the exercise of its legislative or quasi-legislative functions. The project at issue was governed by the DOT Project Plan, which was prepared at DOT's direction and approved by DOT prior to the start of the project. By providing the final approval to the entire Project Plan, DOT thereby made all the relevant decisions about which traffic signals to replace, where to put them, and even the precise size of concrete bases to use.

¶29 In Allstate, we concluded that "the decisions of the [governmental entity] in planning and designing the system in question, including the placement of the manhole, were legislative acts performed in response to its authority to plan and construct sewer systems . . . ." Allstate, 80 Wis. 2d at 15-16 (footnote omitted). Similarly, in choosing to approve the

17

Project Plan in this case, DOT was exercising its legislatively delegated authority to "direct, undertake and expend state and federal aid for planning, promotion and protection activities in the areas of highways, motor vehicles, [and] traffic law enforcement . . . ." Wis. Stat. § 85.02(1). The placement of a traffic signal in a highway project is akin to the placement of a manhole in a sewer system, and "[i]t is not for the court to be judge or jury to 'second guess' [governmental entities] in these determinations nor to find they are liable for negligence." Allstate, 80 Wis. 2d at 16.[15]

¶30 In light of the foregoing, we agree with the circuit court and court of appeals and hold that Pro Electric severed the sewer lateral as an agent implementing a legislative or quasi-legislative DOT design decision. DOT——not Pro Electric—— made the decision to auger that particular hole in that particular place, and all of the evidence suggests that Pro

---

[15] Petitioners argue that "DOT's directive was not the injury-causing act; the injury-causing act was Pro Electric's negligent severing of the sewer lateral through its performance of construction work." However, Petitioners have failed to demonstrate a meaningful distinction between the two in this case. Petitioners concede that the DOT designs directed Pro Electric to excavate using a circular auger to a precise depth in a precise location, and neither side disputes the fact that this is the conduct that severed the sewer lateral. In this situation, immunity depends not on the character of the contractor's acts but "upon the immunity of the governmental act or decision that the agent was implementing when it caused an injury." Showers, 350 Wis. 2d 509, ¶35 (emphasis added). Therefore, our focus is properly on DOT's decision to adopt the specifications that caused Pro Electric to sever the sewer lateral.

Electric severed the sewer lateral not because of the manner in which Pro Electric chose to do the augering, but simply because the Project Plan directed Pro Electric as to exactly where and how to auger.

2. Pro Electric Is Not Immune From Liability For Backfilling the Excavation Without Inspecting the Sewer Lateral

¶31 Petitioners' second allegation is that Pro Electric negligently backfilled its excavation without inspecting the sewer lateral for damage and allowing repairs to be made, despite having a statutory duty to do so. Petitioners argue that, pursuant to Wis. Stat. § 182.0175(2)(am), Pro Electric had an "independent statutory duty to inspect its excavation, to ascertain if the sewer lateral had been or may have been severed or damaged, and to refrain from backfilling its excavation until an inspection was conducted and all necessary repairs were completed."

¶32 Petitioners make two arguments as to why Pro Electric may not enjoy immunity from liability for this allegation. First, Petitioners argue that Pro Electric was not acting as DOT's agent in regard to its compliance with Wis. Stat. § 182.0175(2)(am) and instead was "solely responsible for the means and methods of inspecting its excavation, ascertaining if there was any damage, and refraining from backfilling until all necessary repairs were completed." Second, Petitioners argue that the duties imposed by § 182.0175(2)(am) do not implicate legislative, quasi-legislative, judicial, or quasi-judicial functions under our case law.

19

¶33 Pro Electric does not rebut these arguments. The DOT Highway Work Proposal assigned responsibility to Pro Electric to "[c]oordinate construction activities with a call to Digger's Hotline or a direct call to the utilities that have facilities in the area as required per statutes" and to "[u]se caution to ensure the integrity of underground facilities." The Project Plan did not provide reasonably precise specifications for how to fulfill these responsibilities, and there would have been ample room for Pro Electric's discretion if, for instance, it had discovered a damaged sewer lateral during excavation. A "contractor may not possess such control over the alleged injury-causing action and still be considered an agent for purposes of governmental contractor immunity under Wis. Stat. § 893.80(4)." Showers, 350 Wis. 2d 509, ¶51.

¶34 Therefore, Pro Electric was not acting as DOT's agent in this regard, and immunity would not shield Pro Electric from liability. Given this conclusion, there is no need to proceed to the next step in the analysis and determine whether the duties imposed by Wis. Stat. § 182.0175(2)(am) implicate legislative, quasi-legislative, judicial, or quasi-judicial functions. We therefore do not decide that question.

¶35 For these reasons, Pro Electric does not enjoy governmental immunity for a failure to inspect the excavation to look for the severed sewer lateral and to refrain from backfilling until repairs were made. But our discussion does not end here. Rather, we must now apply the traditional summary judgment standards to the facts of the case.

### D. Summary Judgment

¶36 Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). "[A]ny doubts as to the existence of a genuine issue of material fact are resolved against the moving party. However, evidentiary facts set forth in the affidavits or other proof are taken as true by a court if not contradicted by opposing affidavits or other proof." L.L.N. v. Clauder, 209 Wis. 2d 674, 684, 563 N.W.2d 434 (1997) (citations omitted).

¶37 In order for Petitioners to have a viable common-law negligence claim against Pro Electric for backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made, Petitioners must

> plead facts, which if proved true, would establish the following four elements: (1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the [breach].

Brandenburg v. Briarwood Forestry Servs., LLC, 2014 WI 37, ¶6, 354 Wis. 2d 413, 847 N.W.2d 395 (quoting Hoida, Inc. v. M&I Midstate Bank, 2006 WI 69, ¶23, 291 Wis. 2d 283, 717 N.W.2d 17).

### 1. Pro Electric's Duties under Wis. Stat. § 182.0175(2)(am)

¶38 As to the element of duty, generally "every person is subject to a duty to exercise ordinary care in all of his or her

21

activities." Id., ¶7 (quoting Behrendt v. Gulf Underwriters Ins., 2009 WI 71, ¶3, 318 Wis. 2d 622, 768 N.W.2d 568). In this case, we asked the parties to brief the relevance of the Digger's Hotline statute, in particular Wis. Stat. § 182.0175(2), including a discussion of whether the facts in the record demonstrate compliance with the statute. Although the parties disagree as to whether Pro Electric complied with § 182.0175(2)(am), neither has disputed the notion that demonstrating noncompliance with § 182.0175(2)(am) is essential to Petitioners' claim that Pro Electric was negligent in backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made. Pro Electric conceded at oral argument that noncompliance with § 182.0175(2)(am) would support a negligence claim, and Petitioners have not presented any argument as to how the duty of ordinary care in regard to the specifically alleged negligent conduct would differ from the duties imposed by § 182.0175(2)(am).[16] Therefore, we assume for purposes of

---

[16] Petitioners allege in their Second Amended Complaint that "it was obvious to [Pro Electric's] workers at the time that they were drilling through a sewer lateral," and that Pro Electric was therefore negligent when it "proceeded with the installation of the light pole without warning any of the occupants of the building that the sewer lateral was severed nor did they take remedial action to repair or reroute the sewer lateral around the pole." In their briefs before this court, Petitioners characterize these allegations solely in terms of the duties imposed by Wis. Stat. § 182.0175(2)(am), arguing that Pro Electric had an "independent statutory duty to inspect its excavation, to ascertain if the sewer lateral had been or may have been severed or damaged, and to refrain from backfilling
(continued)

22

deciding this case that Pro Electric's duty of care under the circumstances here is coextensive with the requirements of § 182.0175(2)(am).

¶39 Subsection (2)(am) is titled "Excavation notice" and begins by providing that an excavator shall "[p]rovide advance notice [to Digger's Hotline] not less than 3 working days before the start of nonemergency excavation." Wis. Stat. § 182.0175(2)(am)1. Subsection (2)(am) also requires that, while excavating, the excavator must maintain minimum clearances around any "marking for an unexposed transmission facility that is marked under sub. (2m)," though it may reduce that clearance "[w]hen the underground transmission facility becomes exposed or if the transmission facility is already exposed." § 182.0175(2)(am)3. Additionally, after the excavation is complete, the excavator must, "[b]efore backfilling, inspect all transmission facilities exposed during excavation to ascertain if the transmission facilities have been or may have been struck, damaged, dislocated or disrupted," and shall "[r]efrain from backfilling an excavation until an inspection is conducted and any necessary repairs have been made by the owner of the transmission facility." § 182.0175(2)(am)6.-6m.

   2. There Is No Issue of Material Fact As To Whether Pro
      Electric Complied With Its Duties Under Wis. Stat.
                     § 182.0175(2)(am)

_____

its excavation until an inspection was conducted and all necessary repairs were completed" (emphasis added).

¶40 The undisputed facts in the record establish that Pro Electric complied with its duties under Wis. Stat. § 182.0175(2)(am). There is no dispute that Pro Electric contacted Digger's Hotline at least three days before beginning excavation. Nor is there any evidence to indicate the presence of any markings indicating that the sewer lateral was in the way of the excavation. The statutes clearly impose the duty to mark buried transmission facilities——including sewer laterals——on their owners, not on an excavator. § 182.0175(2m)(a)(2). Nothing in the record permits a reasonable inference that the presence of the sewer lateral was anything other than a surprise to all involved.

¶41 Further, there are no facts from which it could be inferred that the sewer lateral was a "transmission facilit[y] exposed during excavation," triggering Pro Electric's duty to inspect it for damage and refrain from backfilling until repairs could be made. Wis. Stat. § 182.0175(2)(am)6.-6m. Clements explained in his deposition that augering generally pulverizes and grinds the material together, making it highly unlikely that pieces of a clay pipe would be identifiable in clay soil. He testified that when Pro Electric hit a different sewer lateral on a previous excavation, Pro Electric noticed it because pieces of green PVC material were visible amid the soil that was coming up. But here, both the buried sewer lateral and the surrounding soil consisted of clay-colored material. Furthermore, the hole was relatively narrow, being 14 feet deep while only 30 inches wide. Augering in this situation, Clements stated, generally

24

"creates a situation where the technician operating the auger has no ability to see into the hole which is being augered." The lateral here could not have been open to view, because of the way that an auger typically "will push everything into any voids in the hole, so as you look in a hole you will not see a pipe or anything because [the hole] gets packed with dirt." Clements further stated that, although Keller was supervising Pro Electric's work and one of Pro Electric's employees was assigned to monitor the auger and periodically clean it with a shovel, no one reported seeing any indication that they had hit a sewer lateral.

¶42 Petitioners do not dispute these facts except to argue that, because Clements was not present at the job site, his deposition cannot "conclusively establish[] that Pro Electric inspected its excavation, ascertained if the sewer lateral had been or may have been severed or damaged, and refrained from backfilling its excavation . . . as required by Wis. Stat. § 182.0175(2)(am)." However, the statute does not require Pro Electric to inspect its excavation; rather, it requires inspection of transmission facilities exposed during the excavation. Wis. Stat. § 182.0175(2)(am)6.-6m. The only evidence Petitioners produced in this regard was a photograph taken after the fact, which depicted wider excavations done later to repair the sewer lateral and in no way represented that the sewer lateral would have been exposed to Pro Electric at the time of augering. A party opposing summary judgment "must show, by affidavit or other proof, the existence of disputed material

25

facts or undisputed material facts from which reasonable alternative inferences may be drawn that are sufficient to entitle the opposing party to a trial." Clauder, 209 Wis. 2d at 683. Petitioners have not met this burden, because the undisputed material facts they have presented do not support a reasonable inference that Pro Electric violated § 182.0175(2)(am).

¶43 Therefore, we hold that Petitioner has not identified any material fact supporting a reasonable inference that Pro Electric failed to comply with its duties under Wis. Stat. § 182.0175(2)(am). Pro Electric did what it was required to do under the statute, and based on the record before us, Petitioners' attempts to suggest that the sewer lateral was exposed to Pro Electric during the excavation amount to mere speculation. Pro Electric is therefore entitled to summary judgment.

## V. CONCLUSION

¶44 We hold that Pro Electric is immune from liability for Petitioners' allegations that it was negligent in severing the sewer lateral, and we hold that Pro Electric is entitled to summary judgment on Petitioners' allegation that it was negligent in backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made pursuant to Wis. Stat. § 182.0175(2)(am).

¶45 Pro Electric is immune from liability for severing the sewer lateral, because it acted in accordance with reasonably precise design specifications adopted by a governmental entity

26

in the exercise of its legislative, quasi-legislative, judicial, or quasi-judicial functions.  At the same time, Pro Electric is not immune from liability for backfilling without inspecting the sewer lateral pursuant to Wis. Stat. § 182.0175(2)(am), because DOT did not provide Pro Electric with precise specifications for inspecting damaged utilities before backfilling pursuant to § 182.0175(2)(am), so Pro Electric was not DOT's agent with regard to these duties.  Ultimately, however we affirm the circuit court's grant of summary judgment on the factual record before us.  We do so because the undisputed material facts do not support a reasonable inference that Pro Electric failed to comply with its duties in § 182.0175(2)(am).  For these reasons, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶46 SHIRLEY S. ABRAHAMSON, J. *(concurring)*. I agree that the decision of the court of appeals should be affirmed. I would affirm the decision, however, by dismissing the petition for review as having been improvidently granted.

¶47 The court should dismiss the petition as improvidently granted because, as the majority opinion explains at length, the two issues the parties raised were decided by the court of appeals consistently with Showers Appraisals, LLC v. Musson Bros., Inc., 2013 WI 79, 350 Wis. 2d 509, 835 N.W.2d 226, and Estate of Lyons v. CNA Insurance Companies, 207 Wis. 2d 446, 558 N.W.2d 658 (Ct. App. 1996).[1] The majority opinion should not be read as deviating from Showers and Lyons or changing our governmental contractor immunity law in any way.

¶48 A third issue was directed to the parties in the court's order granting the petition for review. The parties were directed to address whether the Diggers Hotline statute, Wis. Stat. § 182.0175(2), creates a ministerial duty, and to discuss the relevance of the statute to the case, whether the facts in the record demonstrate compliance with the statute, and if so, how. Justices Ann Walsh Bradley and Annette K. Ziegler concurred in this order, expressing their concern that this

---

[1] The parties raised two issues for this court to address:

Was Pro Electric Contractors acting as a governmental agent as that term is used in Wis. Stat. § 893.80(4)?

Was the alleged injurious conduct caused by the implementation of a government decision for which immunity is available under Wis. Stat. § 893.80(4)?

1

third issue "could place this court in the role of fact-finder." Their concern proved prescient.

¶49 With regard to this third issue, the majority opinion recites and applies well-established principles of summary judgment law, and then declares that no issue of material fact exists regarding whether Pro Electric complied with its duties under Wis. Stat. § 182.0175(2).

¶50 My final comment on dismissal regards issues that members of the court have raised previously in government immunity cases, but that are not raised or answered by the parties or the court in the instant case: Should the court revisit the interpretation of Wis. Stat. § 893.80? Revisit Wisconsin case law defining legislative, quasi-legislative, judicial, and quasi-judicial functions? And revisit Holytz v. City of Milwaukee, 17 Wis. 2d 26, 115 N.W.2d 618 (1962)?[2] These issues are not before the court and should not be decided in the instant case. We should not bypass the adversary process.[3]

---

[2] See Bostco LLC v. Milwaukee Metro. Sewage Dist., 2013 WI 78, ¶¶131-138, 350 Wis. 2d 554, 835 N.W.2d 160 (Abrahamson, C.J., dissenting); Nicholas J. Bullard, Comment, Pushing the Reset Button on Wisconsin's Governmental Immunity Doctrine, 2014 Wis. L. Rev. 801.

[3] "As various members of this court have said, we should not 'reach out and decide issues' that were not presented to the court by the parties." Dairyland Greyhound Park, Inc., v. Doyle, 2006 WI 107, ¶335, 295 Wis. 2d 1, 719 N.W.2d 408 (Roggensack, J., concurring in part and dissenting in part) (quoting Town of Beloit v. Cty. of Rock, 2003 WI 8, ¶72, 259 Wis. 2d 37, 657 N.W.2d 344 (Abrahamson, C.J., dissenting)). See also State v. Thompson, 2012 WI 90, ¶¶9, 57, 342 Wis. 2d 674, 680, 695, 818 N.W.2d 904 (declaring that the court should not decide issues that are not briefed).

(continued)

¶51 Because the majority opinion does not in any way develop the law of the state, which is the function of this court,[4] the petition for review should be dismissed as improvidently granted.

---

The United States Supreme Court has often explained the fundamental importance of the adversarial presentation of issues. See, e.g., Penson v. Ohio, 488 U.S. 75, 84 (1988); Polk Cty. v. Dodson, 454 U.S. 312, 318 (1981); Mackey v. Montrym, 443 U.S. 1, 13 (1979).

[4] Wis. Stat. § (Rule) 809.62(1r); State v. Moeck, 2005 WI 57, ¶94, 280 Wis. 2d 277, 314, 695 N.W.2d 783, 802 (Prosser, J., dissenting) ("The [Wisconsin] supreme court is a law-defining, law-developing court.") (citing Cook v. Cook, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997)).

¶52 REBECCA GRASSL BRADLEY, J. *(dissenting).* When this court abrogated the common law doctrine of sweeping governmental immunity in Holytz v. City of Milwaukee, 17 Wis. 2d 26, 115 N.W.2d 618 (1962), it lamented that "[t]he rules surrounding municipal tort immunity have resulted in . . . highly artificial judicial distinctions." Id. at 32. More than a half century later, "artificial judicial distinctions" once again pervade our governmental immunity cases, and the majority overlooks an opportunity to fix this creeping error. Although the legislature grants immunity to certain governmental entities and their agents only "for acts done in the exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions," Wis. Stat. § 893.80(4) (2015-16),[1] the majority opinion leaves in place a judicial distortion of this statutory language that instead ties immunity to a "discretionary" versus "ministerial duty" test invented by the judiciary. The court supplants the legislature's textually limited immunity in favor of an expansive interpretation of a doctrine long ago abolished but nevertheless repeatedly resurrected by this court's problematic case law. Because the majority opinion perpetuates a non-textual interpretation of § 893.80(4), I respectfully dissent. Further, because a genuine issue of material fact exists as to whether Pro Electric inspected the hole before filling it, I would reverse the court of appeals' decision and remand for further proceedings.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

1

I

¶53 The Holytz court unsparingly criticized governmental immunity, explaining that the doctrine's "origin seems to be found in the ancient and fallacious notion that the king can do no wrong."  17 Wis. 2d at 33 (internal quotation mark omitted) (quoting Britten v. City of Eau Claire, 260 Wis. 382, 386, 51 N.W.2d 30 (1952)). For decades before Holytz, multiple courts and scholars foreshadowed the Holytz court's critique.  Almost a century ago, Justice Wanamaker of the Ohio Supreme Court observed that governmental immunity "has been shot to death on so many different battlefields that it would seem utter folly now to resurrect it."  Fowler v. City of Cleveland, 126 N.E. 72, 77 (Ohio 1919) (Wanamaker, J., concurring).  More than 70 years ago, the New Mexico Supreme Court exclaimed:

> It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong", should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.

Barker v. City of Santa Fe, 1943-NMSC-012, ¶11, 136 P.2d 480 (internal quotation mark omitted) (quoting Annotation, 75 A.L.R. 1196 (1931)).  Later, the Florida Supreme Court determined: "[T]he time has arrived to declare this doctrine [anachronistic] not only to our system of justice but to our traditional

2

concepts of democratic government." Hargrove v. Town of Cocoa Beach, 96 So. 2d 130, 132 (Fla. 1957). Joining other courts in retracting an antiquated common law doctrine, this court unequivocally held, "[H]enceforward, so far as governmental responsibility for torts is concerned, the rule is liability—the exception is immunity." Holytz, 17 Wis. 2d at 39.

¶54 Mindful of its role under Wisconsin's constitutional structure, this court acknowledged that, "[i]f the legislature deems it better public policy, it is, of course, free to reinstate immunity." Id. at 40. This court also explained the scope of its abrogation: "Our decision does not broaden the government's obligation so as to make it responsible for all harms to others; it is only as to those harms which are torts that governmental bodies are to be liable by reason of this decision." Id. at 39-40 (emphasis added). Specifically, this court added that its decision should not "be interpreted as imposing liability on a governmental body in the exercise of its legislative or judicial or quasi-legislative or quasi-judicial functions." Id. at 40 (citing Hargrove, 96 So. 2d at 133).

¶55 A year later, the legislature responded by enacting an exception to liability echoing the language in Holytz, granting immunity only "for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Laws of 1963, ch. 198, § 331.43(3). As amended, the current statutory language remains substantially similar:

> No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers,

3

officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees <u>for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions</u>.

Wis. Stat. § 893.80(4) (emphasis added).

¶56 Over time, however, this court's decisions in governmental immunity cases have enlarged the limited exception to liability first articulated in <u>Holytz</u> and, importantly, later adopted by the legislature. Recently, the court described the current state of Wisconsin law:

> The court has interpreted the words "legislative, quasi-legislative, judicial or quasi-judicial functions" in Wis. Stat. § 893.80(4) to be synonymous with the word "discretionary." If an act is discretionary, then governmental immunity provided by Wis. Stat. § 893.80(4) applies. There is no immunity, however, for liability associated with "the performance of ministerial duties imposed by law."

<u>Legue v. City of Racine</u>, 2014 WI 92, ¶42, 357 Wis. 2d 250, 849 N.W.2d 837 (footnote omitted) (first citing <u>Lister v. Bd. of Regents</u>, 72 Wis. 2d 282, 301, 240 N.W.2d 610 (1976); then quoting <u>Brown v. Acuity</u>, 2013 WI 60, ¶42, 348 Wis. 2d 603, 833 N.W.2d 96).[2] The majority does not disturb that interpretation, explaining that, although Wis. Stat. § 893.80(4) "is best

---

[2] For in-depth discussion of the governmental immunity doctrine's evolution since <u>Holytz</u>, see generally <u>Legue v. City of Racine</u>, 2014 WI 92, ¶¶35-43, 357 Wis. 2d 250, 849 N.W.2d 837; <u>Bostco LLC v. Milwaukee Metro. Sewerage Dist.</u>, 2013 WI 78, 350 Wis. 2d 554, 835 N.W.2d 160 (Gableman, J., concurring); <u>Umansky v. ABC Ins. Co.</u>, 2009 WI 82, 319 Wis. 2d 622, 769 N.W.2d 1 (Prosser, J., concurring); <u>Willow Creek Ranch, L.L.C. v. Town of Shelby</u>, 2000 WI 56, ¶¶60-99, 235 Wis. 2d 409, 611 N.W.2d 693 (Prosser, J., dissenting).

interpreted 'by applying the legislature's chosen plain language, rather than a judicial distillation thereof,'" the court's "decision is not intended in any way to alter [the 'discretionary'] standard." Majority op., ¶19 n.13 (internal quotation mark omitted) (quoting Showers Appraisals, LLC v. Musson Bros., 2013 WI 79, ¶35, 350 Wis. 2d 509, 835 N.W.2d 226).

¶57 Criticism of this court's interpretation of Wis. Stat. § 893.80(4) is well-documented in recent cases and need not be repeated at length. See, e.g., Legue, 357 Wis. 2d 250, ¶43 ("The court's explication and application of the doctrine of governmental immunity under Wis. Stat. § 893.80(4) has come under increasing criticism by members of the court."); Bostco LLC v. Milwaukee Metro. Sewerage Dist., 2013 WI 78, ¶103, 350 Wis. 2d 554, 835 N.W.2d 160 (Gableman, J., concurring) ("[T]his court continues to apply a series of doctrines that have no connection to the text of the municipal immunity statute . . . or our decision to abrogate all governmental immunity in Holytz . . . ."); Umansky v. ABC Ins. Co., 2009 WI 82, ¶78, 319 Wis. 2d 622, 769 N.W.2d 1 (Prosser, J., concurring) ("So far as government responsibility for torts is concerned, immunity has become the rule and liability has become the rare exception. Justice has been confined to a crawl space too narrow for most tort victims to fit."); Scott v. Savers Prop. & Cas. Ins. Co., 2003 WI 60, ¶79, 262 Wis. 2d 127, 663 N.W.2d 715 (Prosser, J., dissenting) ("In effect, this methodology has made the rule become immunity——the exception, liability.").

5

¶58 Justice Gableman's concurrence in Bostco LLC v. Milwaukee Metropolitan Sewerage District, 2013 WI 78, 350 Wis. 2d 554, 835 N.W.2d 160, stands out among the critiques because it offers an alternative interpretation of Wis. Stat. § 893.80(4). The Bostco concurrence advocates "adopt[ing] the 'planning-operational distinction' to determine whether governmental action is 'legislative, quasi-legislative, judicial, or quasi-judicial.'" 350 Wis. 2d 554, ¶103. That approach "grants immunity only to upper-level legislative, judicial, executive and administrative policy and planning decisions rather than to any decision that might be made." Id. (emphasis added) (quoting 18 Eugene McQuillin, The Law of Municipal Corporations § 53:16, at 236 (3d ed. 2013) [hereinafter McQuillin]). Compared to the prevailing interpretation of Wis. Stat. § 893.80(4) as granting immunity to "discretionary" acts, the planning-operational distinction comes closer to narrowing the field of what this court deems "legislative, quasi-legislative, judicial or quasi-judicial functions."[3] Using the planning-operational distinction as a definition of the statutory phrase, however, suffers from the same shortcoming that afflicts the court's current approach: it replaces the legislature's chosen language with a judicially manufactured standard.

---

[3] For further discussion of the planning-operational distinction in the context of Wisconsin law, see also Nicholas J. Bullard, Comment, Pushing the Reset Button on Wisconsin's Governmental Immunity Doctrine, 2014 Wis. L. Rev. 801, 824-28.

¶59 Rather than layering the court's favored standard over the statutory text——or simply asserting that a particular action is "legislative or quasi-legislative," as the majority does here——the appropriate interpretive tool is to critically assess the original meaning of "legislative, quasi-legislative, judicial or quasi-judicial functions."[4] The specific language chosen by the legislature in Wis. Stat. § 893.80(4) parallels the exception to liability crafted by this court's Holytz opinion, which cited Hargrove v. Cocoa Beach, 96 So. 2d 130 (Fla. 1957), when introducing into Wisconsin law an exception for acts pursuant to "legislative or judicial or quasi-legislative or quasi judicial functions." Holytz, 17 Wis. 2d at 40. In Hargrove, the Florida Supreme Court also stopped short of absolutely abrogating common law immunity:

> We think it advisable to protect our conclusion against any interpretation that would impose liability on the municipality in the exercise of legislative or judicial, or quasi-legislative or quasi-judicial, functions as illustrated in such cases as Elrod v. City of Daytona Beach, 180 So. 378; and Akin v. City of Miami, Fla.1953, 65 So.2d 54.

Hargrove, 96 So. 2d at 133 (citations omitted).

¶60 Careful review of the two cases cited in Hargrove clarifies that the Florida Supreme Court sought to preserve immunity for a narrowly tailored set of governmental functions bearing a particular legislative or judicial character. In Elrod v. City of Daytona Beach, 180 So. 378 (Fla. 1938), the

---

[4] State ex rel. Kalal v. Circuit Court for Dane County, 2004 WI 58, ¶¶44-52, 271 Wis. 2d 633, 681 N.W.2d 110, outlines the principles of statutory interpretation.

7

Florida Supreme Court upheld a city's immunity in a suit by a traveling salesman who sought damages resulting from his arrest for violating an allegedly unconstitutional ordinance. Id. at 378-79. The court explained that "the action of the city in adopting the ordinance in question was . . . a legislative act . . . . For errors of judgment in the exercise of such powers the cities are not liable . . . ." Id. at 379 (quoting Trescott v. City of Waterloo, 26 F. 592, 594 (C.C.N.D. Iowa 1885), which cited Fowle v. Common Council of Alexandria, 28 U.S. (3 Pet.) 398 (1830)).

¶61 Likewise, in Akin v. City of Miami, 65 So. 2d 54 (Fla. 1953), the Florida Supreme Court upheld a city's immunity in a suit seeking damages resulting from its denial of a building permit, explaining that, "inasmuch as the granting or withholding of a building permit by a municipality was the exercise of a purely governmental function, the city could not be held liable in a tort action for damages for the wrongful refusal to issue such a permit." Id. at 55. Immunity for enactment of an ordinance, as in Elrod, implicates actions with uniquely legislative character, while immunity for a decision to deny a permit after applying law to facts, as in Akin, implicates action of a more judicial nature.

¶62 The legislative and judicial actions immunized in Elrod and Akin align well with the ordinary meaning of the words found in Wis. Stat. § 893.80(4). A "function" refers to an "[a]ctivity that is appropriate to a particular business or profession." Function, Black's Law Dictionary 787 (10th ed.

8

2014) [hereinafter Black's]; see also The American Heritage Dictionary of the English Language 710 (5th ed. 2011) [hereinafter American Heritage] (defining "function" as "[t]he action or purpose for which a person or thing is suited or employed"). "Legislative" means "[o]f, relating to, or involving lawmaking or the power to enact laws; concerned with making laws." Legislative, Black's, supra, at 1039. "Judicial," in turn, means "[o]f, relating to, or involving a judgment." Judicial, id. at 974. The prefix "quasi" means "[s]eemingly but not actually; in some sense or degree; resembling; nearly." Quasi, id. at 1439.[5]

¶63 Taken together, these definitions suggest that the phrase "legislative, quasi-legislative, judicial or quasi-judicial functions" grants immunity to the entities listed in Wis. Stat. § 893.80(4) only for actions pertaining to making or enacting laws, actions involving an exercise of judgment in an adjudicative sense, or actions otherwise resembling lawmaking or adjudication. Essentially, the statutory text contemplates immunity for the enumerated entities and their agents within the limited sphere of authority by which government makes and adjudicates law. Toward that end, this court properly recognizes that "[t]he purpose of [governmental] immunity is to ensure that courts refuse to pass judgment on policy decisions

---

[5] See also Quasi-legislative, Black's Law Dictionary 1440 (10th ed. 2014) ("(Of an act, function, etc.) not purely legislative in nature . . . ."); Quasi-judicial, id. ("Of, relating to, or involving an executive or administrative official's adjudicative acts.").

in the province of coordinate branches of government, if such a policy decision, consciously balancing risks and advantages, took place." Legue, 357 Wis. 2d 250, ¶40 (second alteration in original) (quoting Scarpaci v. Milwaukee Cty., 96 Wis. 2d 663, 687, 292 N.W.2d 816 (1980)).[6] Returning to an interpretation tethered to the text of Wis. Stat. § 893.80(4) would safeguard the separation of powers among the branches of government without shifting to innocent victims the burden of losses caused by government actors and agents.

¶64 The planning-operational distinction, suggested by Justice Gableman in Bostco, seeks to restore some limitations on immunity, inching closer to the actual text Wis. Stat. § 893.80(4): "[A] decision to adopt (or not adopt) a certain policy would be shielded by immunity, but the implementation of the policy would be subject to traditional tort standards." Bostco, 350 Wis. 2d 554, ¶112 (Gableman, J., concurring). Although the discretionary-ministerial distinction purportedly arose out of similar "concerns over courts interfering with other branches of government," 18 McQuillin, supra, § 53:4, at 168-69, it inevitably regressed from protecting political decisions to immunizing the destruction of private property.

---

[6] One commentator similarly described immunity's purpose: "[P]ublic policy justifies applying immunity where the challenged government action is of a policymaking character——involving social, economic, or political judgments——and where the government action is best monitored through the political process rather than through tort actions." Linda M. Annoye, Comment, Revising Wisconsin's Government Immunity Doctrine, 88 Marq. L. Rev. 971, 981 (2005).

Because both tests substitute, by judicial fiat, a grossly circumscribed limit on government immunity undetectable in the language actually chosen by the legislature, neither is compatible with the comparatively narrow governmental immunity actually found in the text of Wis. Stat. § 893.80(4).[7]

¶65 Restoring an interpretation of Wis. Stat. § 893.80(4) properly grounded in that section's text would bring coherence and predictability to our governmental immunity jurisprudence. If a municipality acts in a formal capacity pursuant to its powers derived from the State, it might reasonably be immune from liability caused by, for example, an ordinance declared unconstitutional or a decision to deny a permit. Critically, immunity would no longer attach to negligent actions by a

---

[7] The "guided balancing test" proposed by Andrea Dudding, Comment, Reining in Municipalities: How to Tame the Municipal Immunity Monster in Wisconsin, 2004 Wis. L. Rev. 1741, would similarly depart inappropriately from the text of Wis. Stat. § 893.80(4). Engineering a balancing test risks replacing predictable rules of law with the will or whim of the court:

> [A]t the point where an appellate judge says that the remaining issue must be decided on the basis of the totality of the circumstances, or by a balancing of all the factors involved, he begins to resemble a finder of fact more than a determiner of law. To reach such a stage is, in a way, a regrettable concession of defeat——an acknowledgment that we have passed the point where "law," properly speaking, has any further application. . . . [E]quality of treatment is difficult to demonstrate and, in a multi-tiered judicial system, impossible to achieve; predictability is destroyed; judicial arbitrariness is facilitated . . . .

Antonin Scalia, Essay, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1175-82 (1989).

government actor (or agent) disconnected from the government's truly legislative, quasi-legislative, judicial, or quasi-judicial functions. Characterizing the installation of a traffic light pole as a legislative or quasi-legislative act is the latest absurdity generated by the misapplication of the governmental immunity doctrine.[8] See Scott, 262 Wis. 2d 127, ¶82

---

[8] Because it conflates legislative and quasi-legislative decision-making with execution of a construction project plan, the majority mistakenly concludes that Pro Electric can be immune from liability for severing the sewer lateral. Majority op., ¶¶28-30. The majority reaches this conclusion based on Allstate Insurance Co. v. Metropolitan Sewerage Commission of Milwaukee County, 80 Wis. 2d 10, 258 N.W.2d 148 (1977), which concluded that the Commission was immune from liability for placement of a manhole: "Where, when and how to build sewer systems are legislative determinations imposed upon a governmental body. It is not for the court to be judge or jury to 'second guess' them in these determinations nor to find they are liable for negligence." Id. at 15-16 (footnote omitted). The Allstate court's immunity analysis properly asked whether governmental conduct was legislative or quasi-legislative in nature. At the time, the court still seemed to recognize the distinction between immunity for policy determinations pursuant to lawmaking authority and liability for implementation of those decisions. Compare Dusek v. Pierce Cty., 42 Wis. 2d 498, 506, 167 N.W.2d 246 (1969) ("[W]hether or not to place a stop sign, a warning sign, or a yield sign at the approach to a county trunk highway is a legislative decision that must be undertaken by the county board and not by the courts."), with Chart v. Dvorak, 57 Wis. 2d 92, 100-01, 203 N.W.2d 673 (1973) ("[O]nce appellants made the legislative or quasi-legislative decision to place the highway warning sign, they had a duty to place it and maintain it without negligence." (emphasis added)).

Even if immunity's tendrils reached all the way to DOT's planning decisions here, immunity would not extend to negligent implementation of DOT's plan. The majority grants Pro Electric immunity because the majority concludes there is no evidence Pro Electric deviated from DOT's plan. See majority op., ¶30. A lack of proof of negligence may absolve Pro Electric of liability, but whether Pro Electric acted negligently presents a different question than whether Pro Electric was immune from
(continued)

12

(Prosser, J., dissenting) ("In determining today that a school counselor is immune from liability for advising a student that [a course was] an acceptable NCAA-approved course when the counselor had access to a . . . document listing [the course] as [not acceptable], this court has . . . [reached a] result [that] is profoundly wrong and unjust."). This court should not persist with an interpretation of Wis. Stat. § 893.80(4) that artificially prohibits redress for wrongs committed by the government. The government can do wrong, and when it does, it should be held accountable to those damaged by its transgressions.

## II

¶66 The majority opinion appropriately applies the two-part framework for analyzing government contractor immunity, determining first whether the contractor was an agent and second whether the action was one for which immunity is available Majority op., ¶¶19-20 (citing Showers, 350 Wis. 2d 509). Using this framework, I agree with the majority's determination that "Pro Electric does not enjoy governmental immunity for a failure to inspect the excavation to look for the severed sewer lateral and to refrain from backfilling until repairs were made." Majority op., ¶35. A contractor's alleged negligent failure to inspect an excavation before backfilling clearly bears no

---

liability. Here, the manner in which Pro Electric augured the hole and severed the sewer lateral bears no resemblance to lawmaking or adjudication; consequently, Pro Electric cannot be immune from liability for any negligence in performing these services.

13

resemblance to lawmaking or adjudication and therefore does not constitute a "legislative, quasi-legislative, judicial or quasi-judicial function[]" for immunity purposes under Wis. Stat. § 893.80(4).

¶67 I disagree, however, with the majority's conclusion that Petitioners have "not identified any material fact supporting a reasonable inference that Pro Electric failed to comply with its duties under Wis. Stat. § 182.0175(2)(am)." Majority op., ¶43. A court may grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). "'Any reasonable doubt as to the existence of a genuine issue of material fact must be resolved against the moving party' for summary judgment." Schmidt v. N. States Power Co., 2007 WI 136, ¶24, 305 Wis. 2d 538, 742 N.W.2d 294 (quoting Heck & Paetow Claim Serv., Inc. v. Heck, 93 Wis. 2d 349, 356, 286 N.W.2d 831 (1980)).

¶68 Wisconsin Stat. § 182.0175(2)(am) establishes several duties for excavators, two of which are relevant here:[9]

> (am) Excavation notice. An excavator shall do all of the following:
>
> . . . .

---

[9] "Excavator" is a defined term under Wis. Stat. § 182.0175(1)(bm).

14

6. Before backfilling, inspect all transmission facilities exposed during excavation to ascertain if the transmission facilities have been or may have been struck, damaged, dislocated or disrupted.

6m. Refrain from backfilling an excavation until an inspection is conducted and any necessary repairs have been made by the owner of the transmission facility.

"Transmission facilities" is a defined term in the statute and includes all underground pipes, as well as "drainage and water facilities and sewer systems." § 182.0175(1)(c).

¶69 The majority identifies a subtle aspect of Wis. Stat. § 182.0175(2)(am)6: "[T]he statute does not require Pro Electric to inspect its <u>excavation</u>; rather, it requires inspection of <u>transmission facilities exposed</u> during the excavation." Majority op., ¶42. Recognizing that subdivision 6 creates a duty to inspect exposed transmission facilities rather than a duty to inspect the excavation itself properly focuses interpretation of the subdivision on the word "exposed." To "expose" something is "to make [it] visible." <u>American Heritage</u>, <u>supra</u>, at 625; <u>see also</u> <u>Webster's Third New International Dictionary</u> 802 (1986) [hereinafter <u>Webster's</u>] (defining "expose" as "lay open to view: lay bare: make known: set forth"). Here, Pro Electric did not see or know about the severed clay sewer lateral because it blended in with the surrounding soil, and after-the-fact pictures of the trenched lateral do not establish that it was exposed during excavation.

¶70 But our analysis does not end there. Wisconsin Stat. § 182.0175(2)(am)6m also imposes a duty to refrain from backfilling "until an inspection is conducted." One reasonable reading of the statute might be to assume the inspection

15

mentioned in subdivision 6m is the same "inspect[ion of] all transmission facilities exposed during excavation" required by subdivision 6. The scope-of-subparts canon of statutory construction, however, counsels against reading such independent subdivisions together in that manner. See Antonin Scalia & Bryan A. Garner, Reading Law 156-60 (2012) ("Material within an indented subpart relates only to that subpart; material contained in unindented text relates to all the following or preceding indented subparts."). Subdivision 6m is not a subpart of subdivision 6 and speaks in much broader terms. To "inspect" something is "to view closely and critically (as in order to ascertain quality or state, detect errors, or otherwise appraise)" or to "examine with care." Webster's, supra, 1170; see also American Heritage, supra, at 908 ("To examine carefully and critically, especially for flaws."). A duty to inspect suggests excavators must conduct a careful, critical examination of the excavation overall to determine whether it created any problems, not limited to exposed transmission facilities, which in this case were obliterated and therefore incapable of exposure.

¶71 Considering the evidence in a light most favorable to Petitioners, I conclude Pro Electric has not demonstrated it is entitled to judgment as a matter of law. The record establishes that people were "looking at" the hole while auguring was ongoing, that lighting would not have revealed the severed lateral during auguring, and that dirt pushed into the sewer lateral would have made it difficult to identify. Those facts

16

do not demonstrate that Pro Electric conducted an inspection of the completed excavation; accordingly, whether an inspection occurred before backfilling presents a genuine issue of material fact.

III

¶72 When abrogating common law doctrine in Holytz, this court showed appropriate attention to its constitutional role by recognizing the legislature's ultimate authority to decide the scope of immunity as a matter of policy. The legislature responded by enacting a statute that now allows immunity only "for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." By continuing to immunize acts bearing no resemblance to legislative or judicial functions, this court once again abandons the plain language of the governmental immunity statute in favor of an archaic judicial doctrine rooted in shielding the government from answering for its tortious wrongs against the people. Because this artificial judicial invention strays from the legislature's formulation, and because Pro Electric has not met the standard for summary judgment, I would reverse the decision of the court of appeals; therefore, I respectfully dissent.

¶73 I am authorized to state that Justice DANIEL KELLY joins this dissent.

17